Good morning, your honors, and may it please the court. Daniel Scott Harawa on behalf of the appellant Alexander Ramirez. It is my distinct pleasure to introduce Corbin Keller and Jonathan Pertelli, third-year law students who will be arguing the case under my supervision. Thank you. Thank you for doing it and supervising them. Much appreciated. And you may begin. Your honor, would you like me to call the case? Yeah, I guess we should do that, I'm sorry. Case number 21, 1221, USA v. Alexander Ramirez-Figueredo, oral argument not to exceed 10 minutes per side. Mr. Keller, you may proceed for the appellant. Good morning, and may it please the court. This case presents two issues. The first, more straightforward issue, is whether the district court committed plain error when it failed to advise Mr. Ramirez of adverse immigration consequences stemming from his guilty plea, as required by federal rule of criminal procedure 11B10. The second, more complicated issue, where even the standard of review is contested, is whether the district court misunderstood its discretion to consider Mr. Ramirez's cooperation with law enforcement as an individualized sentencing factor. Under 18 USC, section 3553, if this court does not vacate Mr. Ramirez's guilty plea on the first issue, it should remand on the second issue with instructions to the district court to consider Mr. Ramirez's cooperation in fashioning its sentence. First, the district court plainly erred when it failed to give the required rule 11 instruction. The government concedes that prongs 1 and 2 of plain error review are satisfied. There was error and it's plain on the record. Can I ask you about that because he seems to have quite a significant criminal history and it's my understanding that stalking would be sufficient to deport him. So how can it be a miscarriage of justice if no matter what he's going to get deported? Your honor, we can't really make any assumptions based off of the record we have here if these offenses, these state offenses, will satisfy the deportation requirements under federal law. And furthermore, there's still the requirement under rule. Why can't we analyze that and determine if it's a deportable offense and then say, well, then it's not a miscarriage of justice because he's getting deported no matter what? That requires factual and legal findings that would require analyzing the state statute itself to see, I think, if it comports with the generic crime required by federal law to qualify for deportation. And even if those offenses could qualify, there's still a danger that a federal drug conviction heightens the probability of deportation in this case. You say there's a danger. Do you have any evidence to support that? Is there anything in the record that you've come forward with to say a third offense maybe is the tipping point when you have two prior offenses, maybe a third, ICE is more likely to detain you and you're more likely to be deported by DHS? Your honor, it's the fact that Mr. Ramirez is in federal custody now and it's a federal drug offense that could heighten the chance that he could be deported. A lot of coulds. A lot of coulds in that sense. Yes, your honor. But the fact remains that the district court was required to deliver the Rule 11 instruction, which it did not. But we agree on that, right? Even the government agrees that one and two are met. So there's no debate that he didn't give this instruction. And so the sole question is, what do we have to show it's a miscarriage of justice? It's not just that it could be prejudicial or something could happen, but something definitely would. Does that make sense? In other words, I'm trying to say I've got to find for your client to win there's a miscarriage of justice. Yes, your honor. In this case, the miscarriage of justice would be that Mr. Ramirez did not enter into a knowing involuntary guilty plea, which is the miscarriage of justice that this court found in the United States via TIA. Because he was not aware of deportation consequences, he could not enter into a knowing involuntary guilty plea. So the miscarriage of justice isn't necessarily that he would have been deported, it's that the guilty plea was not knowing involuntary because he was not aware of these consequences. As the Supreme Court recognized, even a Hail Mary's chance of acquittal at trial could be worth choosing not to enter into this guilty plea. Or likewise, counsel, as the Supreme Court recognized in Padilla, could try and craft a plea agreement that could- We know he would not have, what evidence is there on the record, he would not have pled guilty, right? Because in a TIA, wasn't there evidence in the record? Yes, your honor. We rely on reasonable inferences on the record to determine whether there was a reasonable probability that he would not have taken this guilty plea. But usually the defendant says, is there any evidence, like sworn testimony, that he would go to trial? Not in the record. And we can only rely on inferences in the record. You've got a client who could say, I would go to trial but for this, I would have gone to trial. I think it puts the client and the defendant in a bad position that he is supposed to appraise himself of the deportation consequences in order to- No, he's got a very talented attorney standing in front of me who could advise him of that. And then he could say, no, even knowing all of that, I would have gone to trial. That's what usually happens. In other words, there's an affidavit, there's something in the record saying, had I known this, I would have gone to trial. Your Honor, that would be a post hoc assertion, which this court cannot rely on. Instead, it has to look to the records. But we did in Attia, right? In Attia, they looked at the record that relied on the sentencing memo and the sentencing hearing in Attia. And as the court noted in footnote two of its opinion in Attia, we don't need to explicitly state that Mr. Ramirez would not have gone to trial. Instead, we only have to look to the record. And here, Mr. Ramirez fled his homeland of Cuba, a communist dictatorship at age 18, arriving in this country on a raft and has lived here his entire adult life for the past 30 years. His three children all reside in Michigan and he considers them his proudest accomplishments and he hopes to remain with them after his prison sentence. Do you have a close relationship with his kids? The relationship seems to be strained at the moment. He has a relationship with his eldest daughter who has pledged to try and help him find steady work afterward, but it still factors into his decision making that he wishes to maintain that. Can I ask you about that footnote? Because it says, rather Attia must show a reasonable, now we're quoting the Supreme Court, a reasonable probability that but for the error, he would not have entered the plea. Isn't that the same as going to trial? I think it's whether he would have entered this plea agreement and possibly. Any plea agreement would have the same consequences if he pleads to meth or heroin or whatever. Quite possibly, Your Honor, but there may have still been a way to factor in his cooperation with the government in fashioning a guilty plea if he or his counsel was aware of the immigration consequences because we have no indication anywhere in the record he was ever apprised of deportation consequences as a result. Since his conviction, has the federal government reached out to him and informed him that he's now a candidate for deportation or he's likely to be deported when he's released from his sentence? We don't think so. But the fact remains that this is more likely because he's in federal custody and even then if a plea agreement may have been worked out, given his reasoning. I mean, it's just total speculation on your part. Total speculation. Which is why we asked this court to look to the record based off of the same factual circumstances that were found in Attia because we think this case is even stronger than Attia because Mr. Ramirez is exactly the type of person that Rule 11 was supposed to be given to so that he could be aware of this. And I've noticed my time has expired if there's no further questions. Yes. I just have one. Don't you have to factor into the whole equation the strength of the government's case against him which was exceedingly strong that if he was thinking about going to trial, he'd have to kind of consider his odds and the odds were awfully bad in this case. Your Honor, you're correct that he would have to consider the odds, but as this court recognized in Attia, quoting the Supreme Court, even a Hail Mary's chance of acquittal could be worth it because remaining in the United States is such an important consideration in Mr. Ramirez's decision to enter into a guilty plea. I think this Hail Mary would have to have been about 80 yards, so rather than 40. Your Honor, we can't speculate on Mr. Ramirez's success at trial. We don't know what strategies he could have developed and it's certainly when he enters into his guilty plea, it's all based off of evidence and the facts most favorable to the government. So I don't think we can speculate on his success, especially when remaining in the United States is, from the record, so important to Mr. Ramirez. Okay, thank you, counsel. Counsel for the government. Good morning, Your Honors, and may it please the court. Catherine Delzal on behalf of the United States. I'd like to thank the court for accommodating my request to do this argument remotely. I just want to highlight three basic reasons why Ramirez could not show a reasonable probability that he would not have entered the plea had he been told that the offense makes him legally removable. And just to reiterate, this is up on the court for plain error review, so it is Mr. Ramirez's burden. And what the Supreme Court has instructed is that we are looking at this from the perspective of a defendant who is assessing the relative consequences of a plea versus trial. And so with that perspective in mind, the first point here is that no matter how Mr. Ramirez pleads in this case has no practical consequence for his immigration situation. That makes this case somewhat unique. Why is that? Because, I mean, by my count, he had like 15 crimes in the U.S. never deported him. So why isn't your friend on the other side right that now he's in federal custody? Because he had assaults with a dangerous weapon, he had some, I don't even know how, indecent exposure offenses, I guess is the best way to categorize them. He stole property repeatedly, and the U.S. just left him in the country, so now they finally got him in custody. He even had drug offenses before. Why should we be so sure that this isn't the tipping point versus all these other ones where you all decided not to deport him? So a couple of responses to that. As we mentioned in our brief, at least three of his prior convictions do just indisputably make him removable if you look at the removal statute, or the immigration statute which we cite in our brief. It is the 1996 state conviction for delivery manufacture, a 2012 stalking conviction, and a 2020 state conviction for delivery manufacture. If you look at the statute... You understand what he's saying? He's saying U.S. didn't care before now. I've been doing this stuff my whole time. I think the American citizens might have an opinion on that, but the government sure didn't seem to care until now. That's not quite accurate, and I have further information that admittedly is not in the record, but to the extent the court is concerned about this, I did follow up with a contact from ICE, and he was actually ordered removed in April 2001. To give the court some context, the reason he hasn't been removed is because of the special situation with Cuba, which is that Cuba refuses to take their citizens back. And so they won't issue travel documents for them. So the situation that Mr. Ramirez is in is that he has been not only removable based on these prior convictions, he has actually been ordered removed, and he has just been under an order of supervision from ICE since 2001 because Cuba won't take him back. But at any moment, if diplomatic relations change with Cuba, and I understand there are some active discussions underway between the countries on that topic, he is removable legally and has been since 2001. Isn't it possible that this offense would move him up on the list? I mean, there are a lot of people who are deportable that don't get deported. I think DHS has to make some prosecutorial decisions. So isn't it possible this moves him up higher on the list and makes it more likely, should country conditions change, that he would be deported? I have inquired about that, and to be frank, I haven't gotten a response yet in time for this argument, but if the court is interested in that, I could certainly submit a letter after the argument. My understanding is that it wouldn't make him more of a priority for removal. But again, no point beyond that. I want to follow up with ICE to be sure. But his state convictions are drug convictions, and not just drug convictions, drug trafficking convictions. He has two of them, plus the stalking conviction. And the federal drug conviction, although it is federal, the immigration statute doesn't distinguish between state and federal drug convictions. So my suspicion is that it does not affect his priority for removal. But if the court wants a definite answer on that, I would need to make contact with ICE and follow up on that. What about Atiyah? How do you deal with that case? So Atiyah is different from this case because, of course, Atiyah, unlike this case where Ramirez is just completely removable regardless of what happens in this case, that does not appear to have been the situation in Atiyah. In Atiyah, it was the paradigm case where the offense that Atiyah pled to is the one that makes him removable. And there's no suggestion in the record that he was otherwise removable. Also, there was evidence, at least contemporaneous evidence, in the record to suggest that Mr. Atiyah might have been influenced by deportation consequences. He apparently expressed a sentencing, a strong aversion to his homeland of Syria. His relatives who had stayed in Syria are now displaced all over the world. So there was at least some indication in the record that it may have affected his decision. But again, it's a much different case because if Mr. Atiyah had just been removable no matter what he pled in his case, the government would have made that argument and it would have changed the case. That is the situation with Mr. Ramirez. Do you attach any significance to the fact that his attorney attests that he was informed of all of the rights and consequences of his plea? Is there anything in the record to suggest that the attorney did or did not tell him that there were deportation consequences? I have not seen one way or the other in the record whether his attorney advised him on that. So I am not sure of the answer to that. He had a plea agreement and I reviewed it and it doesn't mention anything about deportation. So whether his attorney advised him independently, I am not sure. Another factor to just get back to- Can I ask you about the cooperation issue? I'm not sure that's come up, but what is the government's position on what exactly happened there? In other words, the defendant testified, stated in sentencing that he had communicated with DEA and offered to be of assistance. I think the government didn't say anything at the time. Is your position that this was all fabricated or is there some truth to it but not enough to warrant a cooperation agreement at this point or something else? So as I understand it from the trial attorney, I am not the trial attorney, but I did inquire about- You are the government. You are the government. Correct. Correct. As I understand it, what happened was he reached out to DEA. It sounded like DEA attempted to meet with him and then he kind of fell off the radar. They were never able to establish a meeting with him. And so they did not consider whether to set up any deals with him or to have him do controlled buys. Apparently it wasn't feasible given his limited contact with them and then when they would circle back with him, he was kind of nowhere to be found or he didn't show up. He did make a proffer, right? Pardon me? He did make a proffer, right? He did make a proffer and as I understand it, the information that he provided was either stale or not verifiable and that is why there was no 5K motion in this case. Has there been any cooperation with him since sentencing? In other words, this whole issue is about the Rule 35 and you can come back within a period of time. Has there been any progress in that respect or any contacts? That is something that I would need to double check and I apologize for not having that information right off the top of my head. I'm not aware of any, but I would want to double check just to be sure. I'm not aware of any- We can ask your friends on the other side too if they have anything to add. Yes. And just to circle back on Judge Guy's point and his questions to- Wait, can I ask one other question on the Rule 35? So as I understand the procedural history, he was remanded to custody by the magistrate judge, right? Pardon me? He was initially, when he was arrested, he was in custody. Yes. And he claims he did controlled by's thereafter. Am I accurate about that? I would have to double check. What I'm aware of is that before he was in custody, he tried to do controlled by's, but he did not have the DEA's permission to do that. Is that what you're asking? Yeah, I was curious if he was let out after he was in custody to do- You know how often law enforcement will get people out of custody to do controlled by's? That would seem to indicate something different than what you're saying. So the timing of that matters. But you can answer Judge Guy's question. Right. And just to answer that question, I'm not aware of any. My impression is that he was in state custody because, of course, he had the pending imprisonment of a female conviction and a pending state conviction as well. And so he was serving state custody at the time, I believe. And just to circle back to Judge Guy's point, this case, he had no defense. He of course was caught red-handed with drugs. He made a confession. So I just wanted to reiterate Judge Guy's point that that is also something that weighs in against the idea that he would have changed his plea had he known of this. And if the court has no further questions, and especially with respect to the second issue in his brief, I think that's straightforward. I think the standard of review is plain error and that there was no error here. Okay. Counsel? Yeah. Judge Guy, do you have any further questions? I do not. Thank you. Okay. Thank you, Counsel. Thank you. You may proceed. I'm sorry. May it please the court. My name is John Percelli and I also represent the petitioner in this case, Mr. Alexander Ramirez. My friend on the other side has focused specifically on the potential of Mr. Ramirez's deportability with regard to that Rule 11 issue and so that's where I'll focus most of my discussion for this rebuttal. And it's important to focus on that Rule 11 issue for a number of reasons. One, because it's the more straightforward of the two issues where there's no dispute about the standard of review as there is in the second issue. And two, a resolution of this case on that first issue would vindicate both of Mr. Ramirez's rights by putting him back at square one and allowing him to potentially reengage in that sentencing hearing. I mean, there's no dispute about the standard of review, but it's not a very friendly standard of review, so. That's fair, Your Honor. Fair point. Fair point. That's fair, Your Honor. Can I ask you a second question? Because you wouldn't get the sentencing hearing back, you'd go all the way back to square one. You would not have, you'd be before the plea hearing. Correct. Correct. Okay. You said sentencing hearing. I'm curious if you were asking. My apologies. No, that's all right. Before you get into the first issue, I just, my one question was all this cooperation preceded his arrest according to your client, correct? That's correct. Okay. So, okay, that's it. That answers my question. I'm happy to answer more questions. No, that's good. Thank you. Go ahead. Sorry. No, no worries. So, with regard to that Rule 11 issue and potential deportability, I'd like to first point out that the government in none of its briefing nor here today has cited any persuasive or mandatory authority for its argument that potential state court convictions would have rendered Mr. Ramirez deportable and thus would have rendered this Rule 11 error, which it precedes, not a violation of his substantial rights. There's no authority on the record anywhere for that. That's sort of your burden to show how his substantial rights were affected. Certainly. I'm just not. I mean, I, do you want to answer? I asked some questions earlier. It just seems like sheer speculation that this third offense may have made things worse for him. I mean, the government, I don't know if you, I assume you were unaware of the points the government just made that he was, yeah. Yeah. It's true, Your Honor. We were unaware of this. So I won't hold that against you, but it just, it just feels to me like we're just total guesswork and you have the burden here to show that it was at least potentially likely that he's now more removable than he was before. Sure. And I'd also like to point out that the evidence that the government has now brought in today is outside of the record and should not be within the scope of this court's decision because what this court has to do based on its holding in a tie of footnote two is look at the record. I know. What's the, what's, what's the, what's the answer to my question? Certainly. What evidence on the record shows that the reasonable, probably, oh, I'm sorry, you asked about the federal conviction raising. Well, this is all about his deportability. Certainly. The whole thing. This is the first time that Mr. Ramirez has ever been put forth in front of a federal court. There is no court that has said that those prior state convictions have rendered him deportable. And what about his 2001? Are you saying that's outside the record? Because that would be in his background, right? We could just look that up. You could, Your Honor, and I see my time has expired. You can answer it. Of course. So it was not in the PSR prepared by the government. And so we do not have any information about that coming into this hearing. But on the basis of the record, as we have it, this was the first time that Mr. Ramirez was ever put forth in front of a federal court. And it's not the state that deports an individual, of course, it's the federal government. And so it seems commonsensical that when we look at a case like this, that a potential conviction in front of a federal court would, as you mentioned in your questioning with the government, potentially move him up on the list, or at least put them on their radar. And it's possible, in fact, probably likely based on the record, in fact, how much Mr. Ramirez has... Do you know of any other cases where we've said that a federal conviction makes it more likely or moves them up a list that they were already on? No. I do not know of any cases, and the government cites none, that say that these state court convictions would render this error not a violation of his substantial rights. And as my friend, or as my co-counsel has mentioned, this is not about whether or not he could stay in the United States, but whether or not he would have the opportunity to make a knowing involuntary plea agreement where he could have potentially argued and negotiated for mitigating circumstances that would potentially have kept him within the United States and allowed him to reconnect with his family as he so desired. Thank you. There are no more questions. Thank you very much. Judge Guy, do you have any? Let me... No, thank you. Thank you very much, counsel. And thank you to the clinic. We really appreciate you taking on this case. Thank you. You're welcome. Thank you. Thank you. Thank you. Thank you. Thank you.